## 2517

James E. GASTINEAU, Respondent v. Leigh MURPHY, Individually, and as Executive Director of the Beaufort County Mental Retardation Board, Beaufort County Council, The State Department of Mental Retardation, Defendants, of whom The Beaufort County Mental Retardation Board is, Appellant.

(473 S.E. (2d) 819)

Court of Appeals

*Charles E. Carpenter, Jr.* and *Deborah Harrison Sheffield,* both of *Richardson, Plowden, Grier & Howser,* Columbia; *James S. Gibson, Jr.* of *Howell, Gibson & Hughes,* Beaufort, *for Appellant.*

*V. M. Manning Smith,* of *Moss & Kuhn,* Beaufort, *for Respondent.*

Heard May 7, 1996.

Decided June 10, 1996; Reh. Den. Aug. 22, 1996.

ANDERSON, Judge:

This is an action under the South Carolina Whistleblower Act, S.C. Code Ann. § 8-27-10 *et seq.* (Supp. 1991), in which the

jury returned a verdict in favor of the Plaintiff, James Gastineau, in the amount of $375,000. The Whistleblower Act became effective March 14, 1988, and was substantially revised effective June 21, 1993. Because Gastineau was terminated in 1990, the original statute applies. The Defendant, Beaufort County Mental Retardation Board, appeals the denial of its trial motions for judgment notwithstanding the verdict and new trial. We affirm.

## STANDARD OF REVIEW

*Townes Assoc., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E. (2d) 773 (1976), is unexcelled in South Carolina in outlining the scope of review in civil cases. *Townes* instructs:

In an action at law, on appeal of a case tried by a jury, the jurisdiction of this Court extends merely to the correction of errors of law, and a factual finding of the jury will not be disturbed unless a review of the record discloses that there is no evidence which reasonably supports the jury's findings. *Odom v. Weathersbee*, 225 S.C. 253, 81 S.E. (2d) 788 (1954).

*Townes*, 266 S.C. at 85, 221 S.E. (2d) at 775.

On appeal from an order granting a directed verdict, the appellate court views the evidence and all reasonable inferences from the evidence in a light most favorable to the party against whom the directed verdict was granted. If the evidence as a whole is susceptible of more than one reasonable inference, a jury issue is created and the motion should have been denied. *See Adams v. G.J. Creel and Sons, Inc.*, — S.C. —, 465 S.E. (2d) 84 (1995); *Whelan v. Welch*, 304 S.C. 548, 405 S.E. (2d) 836 (Ct. App. 1991); *Unlimited Services, Inc. v. Macklen Enterprises, Inc.*, 303 S.C. 384, 401 S.E. (2d) 153 (1991) (d.v. or j.n.o.v.). This does not mean that the court should ignore facts unfavorable to the opposing party. *Love v. Gamble*, 316 S.C. 203, 448 S.E. (2d) 876 (Ct. App. 1994). "In essence, the court must determine whether a verdict for the opposing party 'would be reasonably possible under the facts as liberally construed in his favor.' " *Love*, 448 S.E. (2d) at 879 (quoting *Bultman v. Barber*, 277 S.C. 5, 7, 281 S.E. (2d) 791, 792 (1981)). *See also Small v. Pioneer Machin-*

*ery, Inc.,* 316 S.C. 479, 450 S.E.(2d) 609 (Ct. App. 1994) ("The trial court must eliminate from its consideration all evidence contrary to or in conflict with the evidence favorable to the nonmoving party and give to the nonmoving party every favorable inference that the facts reasonably suggest.").

The Mental Retardation Board argues the court erred in denying its motion for judgment notwithstanding the verdict because there is no evidence Gastineau's employment was terminated because he made a complaint to the South Carolina Department of Mental Retardation. In ruling on motions for directed verdict and judgment notwithstanding the verdict, "the trial court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *McGill v. University of South Carolina,* 310 S.C. 224, 226, 423 S.E. (2d) 109, 111 (1992). "If the evidence yields more than one inference, the motion for directed verdict should be denied." *Garrett v. Locke,* 309 S.C. 94, 98, 419 S.E. (2d) 842, 845 (Ct. App. 1992). In ruling on the directed verdict motion, the trial court does not have the authority to decide credibility issues nor to resolve conflicts in the testimony and evidence. *Garrett, supra.* Procedurally, the motion for judgment notwithstanding the verdict is a renewal of the directed verdict motion and cannot raise grounds beyond those raised in the directed verdict motion. *Glover v. N.C. Mut. Life Ins. Co.,* 295 S.C. 251, 368 S.E. (2d) 68 (Ct. App. 1988).

## FACTS/PROCEDURAL BACKGROUND

In his complaint, Gastineau alleged he was discharged by his supervisor, Leigh Murphy, from his employment with the Beaufort County Mental Retardation Board on October 31, 1990. Leigh Murphy was the Executive Director of the Mental Retardation Board. Gastineau asserted he was discharged because he reported alleged wage and safety violations concerning handicapped clients. He further claimed his discharge came within one year of his report of the violations. In response, the Mental Retardation Board denied Gastineau's allegations. At trial, the court dismissed all defendants except the Mental Retardation Board and denied the Board's motion for directed verdict. During the jury deliberations, the jurors sent a note to the court requesting a response

to certain questions. The court instructed the jury to consider only the evidence submitted at trial. After the jury returned its verdict, the court denied the Board's trial motions in a written order.

Viewing the evidence in the light most favorable to Gastineau, he was hired by the Mental Retardation Board on April 2, 1990, as the director of a residential home for mentally handicapped individuals. Handicapped persons who lived at the home participated in a day program at the Beaufort County Rehabilitation Center. One of the functions of the Rehabilitation Center was to provide employment for the handicapped clients either through a workshop at the center or in the community. Gastineau's wife was employed at the Rehabilitation Center as a trainer/driver. In August of 1990, Mrs. Gastineau informed her husband several handicapped workers were being transported one day a week to clean up a construction site on Fripp Island. Mrs. Gastineau investigated the records at the Rehabilitation Center and learned the construction company was owned by Robert Murphy, the husband of Leigh Murphy, who was the Executive Director of the Mental Retardation Board. Mrs. Gastineau told her husband she was concerned about the wages being paid to the clients and their safety on the site. She also expressed her concerns to her immediate supervisors at the Rehabilitation Center. According to Mrs. Gastineau, her supervisors stated they would have to discuss the matter with Mrs. Murphy.

Gastineau testified that after a few weeks passed he contacted Alice Shook, an employee of the South Carolina Department of Mental Retardation. Ms. Shook provided technical assistance to county employees who worked with residential programs. Ms. Shook testified Gastineau contacted her about the work program at the Rehabilitation Center and expressed concern over how the handicapped clients were paid.[1]

---

[1] According to Shook, federal wage law applies special rules to the compensation of mentally handicapped individuals. As an example, if a mentally handicapped individual can only perform one-half the work of a nonhandicapped individual then the handicapped individual will receive one-half the minimum wage. With respect to the construction site job, a contract bid record from the Rehabilitation Center obtained by Mrs. Gastineau indicated the clean up job would require three hours at minimum wage for a nonhandicapped person. Depending upon the number of handicapped persons sent to the site to perform the work, the wages as computed for the one nonhandi-

After talking with her supervisors, they decided to send Gary Hudson from the licensing division to review the day program at the Rehabilitation Center. At the time of trial, Mr. Hudson was deceased and no written report could be located concerning his investigation. However, Ms. Shook testified she recalled no problems were found. Ms. Shook denied contacting Leigh Murphy about her conversation with Gastineau. She did not know who Mr. Hudson may have talked to while conducting his review in Beaufort.

Gastineau received performance evaluations by Leigh Murphy at three and six months. The three-month evaluation indicated Gastineau was meeting or exceeding expectations in numerous areas, although he was below expectations in others. The six-month evaluation stated he met or exceeded expectations in many areas, but there also were notations of below-level performance. Mr. Gastineau suffers from cerebral palsy and during the job interview he indicated his greatest weakness was manual clerical work. At trial, he testified he felt he was doing alright at the job but was struggling with the required paperwork. On October 3, 1990, Gastineau received a written warning form Leigh Murphy concerning violation of directives. He was assigned nonsupervisory work and was terminated on October 31, 1990.

Leigh Murphy testified she had no knowledge of Gastineau's conversation with Alice Shook when she fired him. She denied being advised by anyone of a complaint concerning wage payments to handicapped clients. According to Murphy, she fired Gastineau because his job performance decreased during the period of his employment and she was concerned about the residential home's ability to pass a state licensing audit. An informal audit conducted by an outside consultant had indicated problems with client records and other regulatory requirements and Murphy felt Gastineau had not adequately addressed these concerns.

At trial, the Board moved for a directed verdict based upon Gastineau's alleged failure to prove it had any knowledge of

capped worker would be divided between those individuals. Two employees of the Rehabilitation Center testified for the defense about the procedures used to evaluate outside contract employment for the handicapped clients and how the supporting documentation is prepared for the Department of Labor.

his whistleblowing activity before his termination and based upon the conclusion Gastineau was terminated because of his poor job performance. Neither James Gastineau nor his wife reported their wage payment concerns to Leigh Murphy. Contrary to her testimony, Mrs. Gastineau's supervisors testified she did not report anything to them. Alice Shook stated she did not discuss Gastineau's report with Murphy. Additionally, Leigh Murphy denied she knew anything about Gastineau's report concerning the wages paid to handicapped workers by her husband's company. However, the jury may have inferred she learned about it during Gary Hudson's review and this was the basis for Gastineau's termination instead of his job performance. It was the jury's responsibility to assess the credibility of the witnesses and weigh the evidence. We find no error in the denial of the motion for directed verdict.[2]

## THE APPLICABLE LAW

Under the Whistleblower Act as originally enacted, a public body may not discharge or terminate any employee of a public body due to the employee's report of a violation of state or federal law. However, if the employee reported a suspected violation without probable cause he could be terminated from employment. The act contained a rebuttable presumption that the employee was wrongfully terminated if the employee was terminated within one year of reporting any violation or wrongdoing. Notwithstanding the provisions of the act, a public body could discharge an employee for causes independent of whistleblowing. *McGill v. University of South Carolina*, 310 S.C. 224, 423 S.E. (2d) 109 (1992); *Gamble v. City of Manning*, 304 S.C. 536, 405 S.E. (2d) 829 (1991).

## PRESUMPTION OF RETALIATION

Within the rubric and aegis of the original Whistleblower Act, there is a presumption of retaliation.

---

[2] The Board also contends the court erred in denying its motion for judgment notwithstanding the verdict because Gastineau's complaint was not protected whistleblowing and he did not make his complaint in good faith. These grounds were not asserted in the motion for directed verdict and cannot be asserted in the motion for judgment notwithstanding the verdict. *See Glover v. N.C. Mut. Life Ins. Co.*, 295 S.C. 251, 368 S.E. (2d) 68 (Ct. App. 1988).

"It is presumed that an employee of a public body who is discharged, otherwise terminated, or suspended from employment, demoted, suffers a decrease in compensation, or is disciplined, otherwise punished, or threatened by a public body . . . within one year after having exposed governmental criminality, corruption, waste, fraud, gross negligence, or mismanagement . . . was wrongfully treated in one or more ways described in this subsection, whichever may be applicable." S.C. Code Ann. § 8-27-30(A) (Supp. 1991).

A presumption is a rule of law by which the finding of a basic fact gives rise to the existence of the presumed fact until the presumption is rebutted by evidence produced by the defendant. *See* Black's Law Dictionary 1185 (6th ed. 1990).

"The presumption established under Subsection (A) is rebuttable, and the burden is on the defendant to demonstrate that the plaintiff was not discharged, otherwise terminated, or suspended from employment, demoted, suffered a decrease in compensation, or was disciplined, otherwise punished, or threatened because he engaged in any of those activities [statutorily] described in Section 8-27-20." S.C. Code Ann. § 8-27-30(B) (Supp. 1991).

### GOOD FAITH

The Whistleblower Statute protects good-faith reporting of suspected misconduct of the employer. It is not necessary to show that any misconduct actually occurred; it is only necessary that the employee reported the suspected wrongdoing in good faith. *McGill v. University of South Carolina*, 310 S.C. 224, 423 S.E. (2d) 109 (1992).

If an employee's evidence meets the test of S.C. Code Ann. § 8-27-30(A) (Supp. 1991), a rebuttable presumption results and the employer must show that the discharge was unrelated to the reports of wrongdoing. *McGill, supra.*

The Whistleblower Statute requires only that the employee not report an alleged violation "without probable cause." The discharge or discipline of an employee who, in good faith, reports a suspected violation constitutes retaliation for which the Statute provides a remedy. Good-faith whistleblowing is protected from retaliation. *McGill, supra.*

## REPORTING/EXPOSING

■ The crux of whistleblowing is the reporting of a violation of law or regulation by a public body or the exposing of waste, fraud, gross negligence or mismanagement.

■ It is axiomatic that there must be a report by the employee. The public body must have notice or knowledge of the report.

## CIVIL CIRCUMSTANTIAL EVIDENCE RULE

■ The doctrine of civil circumstantial evidence is rooted in antiquity. Early on, in *Crane v. The Lessee of Morris, et al.*, 31 U.S. 598, 6 Pet. 598, 8 L.Ed. 514 (1832), the United States Supreme Court recognized circumstantial evidence as a means of proving knowledge. *Crane* explicates the application of the rule:

> Whenever evidence is offered to the jury, which is in its nature *prima facie* proof, or presumptive proof, its character, as such, ought not to be disregarded; and no court has a right to direct the jury to disregard it, or to view it under a different aspect from that in which it is actually presented to them. Whatever just influence it may derive from the character the jury have a right to give it; and in regard to the order in which they shall consider the evidence in a cause, and the manner in which they shall weigh it, the law has submitted it to them to decide for themselves; and any interference with this right would be an invasion of their privilege to respond to matters of fact.

*Crane*, 31 U.S. at 620-21, 6 Pet. at 620-21, 8 L.Ed. at 522.

■ The quintessential definition of circumstantial evidence is stated with certitude in 29 Am. Jur. (2d) *Evidence* § 313 (1994):

> Circumstantial evidence means proof that does not actually assert or represent the proposition in question, but that asserts or describes something else, from which the trier of fact may either (1) reasonably infer the truth of the proposition, in which case the evidence is not only relevant under Rule 401 but is sufficient as well, or (2) at least reasonably infer an increase in the probability that

the proposition is in fact true, in which case the evidence is relevant under Rule 401 (assuming that the proposition is of consequence to the determination of the action) but may not be sufficient by itself to create a question for the trier of fact to decide. (Footnotes omitted.)

Our Supreme Court in *McCready v. Atlantic Coast Line R.*, 212 S.C. 449, 48 S.E. (2d) 193, *cert. denied*, 335 U.S. 827, 69 S.Ct. 53, 93 L.Ed. 381 (1948), stated the rule with exactitude:

Any fact in issue may be established by circumstantial evidence, if the circumstances, which must themselves be proved, lead to the conclusion with reasonable certainty. A well connected train of circumstances is as cogent of the existence of a fact as any array of direct evidence, and may outweigh opposing direct testimony. It is sufficient if there is evidence from which the fact can properly be inferred. 32 C.J.S., *Evidence*, § 1039, pages 1099, 1100. Inferences drawn from physical facts, such as the empty bunkers, may be as strong as direct evidence. Such inferences amount to circumstantial evidence and circumstantial evidence, when sufficiently strong, is as competent as positive evidence to prove a fact. *Powe v. Atlantic Coast Line R. Co.*, 161 S.C. 122, 159 S.E. 473.

*McCready*, 212 S.C. at 455, 48 S.E. (2d) at 196.

Elucidating the commonsensical efficacy of the rule is *Holland v. Georgia Hardwood Lumber Co.*, 214 S.C. 195, 51 S.E. (2d) 744 (1949):

It is a well recognized rule that an issue may be proved by circumstantial evidence. But for circumstantial evidence to be sufficient to warrant the finding of a fact, the circumstances must lead to the conclusion with reasonable certainty, and must have sufficient probative value to constitute the basis for a legal inference, and not for mere speculation. The facts and circumstances shown should be reckoned with in the light of ordinary experience, and such conclusions deduced therefrom as common sense dictates. *Leek v. New South Express Lines*, 192 S.C. 527, 7 S.E. (2d) 459. The existence of a fact or facts cannot rest in speculation, surmise or conjecture.

*Holland,* 214 S.C. at 204-205, 51 S.E. (2d) at 749. *See also Attaway v. One Chevrolet 5-P Truck,* 228 S.C. 559, 91 S.E. (2d) 270 (1956) (citing *Holland v. Georgia Hardwood Lumber Co.,* 214 S.C. 195, 51 S.E. (2d) 744 (1949)).

"Any fact in issue may be proved by circumstantial evidence as well as direct evidence, and circumstantial evidence is just as good as direct evidence if it is equally as convincing to the trier of the facts." *St. Paul Fire and Marine Ins. Co. v. American Ins. Co.,* 251 S.C. 56, 59-60, 159 S.E. (2d) 921, 923 (1968).

Inevitably, the rule of civil circumstantial evidence is compared to the doctrine of *res ipsa loquitur,* and in *McQuillen v. Dobbs,* 262 S.C. 386, 204 S.E. (2d) 732 (1974), an exercise in academia is presented:

> The principles governing the determination of the sufficiency of circumstantial evidence to establish liability were thus stated in *Chaney v. Burgess,* 246 S.C. 261, 143 S.E. (2d) 521 (1965):
>
> "While our decisions uniformly state that the so called doctrine of *res ipsa loquitur* does not apply in this State, they have with equal uniformity recognized that negligence may be proved by circumstantial evidence as well as direct evidence. And in determining the sufficiency of circumstantial evidence, the facts and circumstances shown are to be reckoned with in the light of ordinary experience and such conclusions deduced therefrom as common sense dictates. Where circumstantial evidence is relied upon to establish liability, the plaintiff must show such circumstances as would justify the inference that has injuries were due to the negligent act of the defendant, and not leave the question to mere conjecture or speculation."

*McQuillen,* 262 S.C. at 391-92, 204 S.E. (2d) at 735.

The evidence relied on by James Gastineau to prove Leigh Murphy or the Beaufort County Mental Retardation Board had knowledge of the report by Mr. or Mrs. Gastineau is circumstantial. In the case *sub judice,* there is no direct evidence of a report to Leigh Murphy or the Beaufort County Mental Retardation Board. The query thus presented is whether there is sufficient circumstantial evidence in the record on the

issue of reporting or exposing.

In totality, the Court comes the the inescapable conclusion that there is sufficient circumstantial evidence in the record to create a factual issue.

### THIRTEENTH JUROR DOCTRINE

The Board also contends the court erred in failing to grant its motion for a new trial because the jury's verdict is not supported by a preponderance of the evidence. Under the "thirteenth juror" doctrine, a trial judge may grant a new trial absolute when he finds the evidence does not justify the verdict. This ruling has also been termed a granting of a new trial upon the facts.

The seminal case stating the thirteenth juror doctrine is *Worrell v. South Carolina Power Co.*, 186 S.C. 306, 195 S.E. 638 (1938). *Worrell* states:

> Nor does it follow that because under the law the trial judge is compelled to submit the issues to the jury, he cannot grant a new trial absolute. As has often been said, the trial judge is the thirteenth juror, possessing the veto power to the Nth degree, and, it must be presumed, recognizes and appreciates his responsibility, and exercises the discretion vested in him with fairness and impartiality.

*Worrell*, 186 S.C. at 313-14, 195 S.E. at 641.

A review of the thirteenth juror doctrine was undertaken by the appellate entity in *Folkens v. Hunt*, 300 S.C. 251, 387 S.E. (2d) 265 (1990):

> This Court has had an opportunity to reconsider the thirteenth juror doctrine on several occasions. Each time we have refused to abolish the doctrine. We have also refused to require trial judges to explain the reasons for the ruling. The thirteenth juror doctrine is a vehicle by which the trial court may grant a new trial absolute when he finds that the evidence does not justify the verdict. This ruling has also been termed granting a new trial upon the facts. *S.C. Highway Dept. v. Townsend*, 265 S.C. 253, 217 S.E. (2d) 778 (1975). The effect is the same as if the jury failed to reach a verdict. The judge as the thirteenth juror "hangs" the jury. When a jury fails to reach a ver-

dict, a new trial is ordered. Neither judge nor the jury is required to give reasons for this outcome. Similarly, because the result of the "thirteenth juror" vote by the judge is a new trial rather than an adjustment to the verdict, no purpose would be served by requiring the trial judge to make factual findings.

A trial judge's order granting or denying a new trial upon the facts will not be disturbed unless his decision is wholly unsupported by the evidence, or the conclusion reached was controlled by an error of law. *South Carolina State Highway Department v. Clarkson*, 267 S.C. 121, 226 S.E. (2d) 696 (1976). When an order granting a new trial is before this Court, our review is limited to the consideration of whether evidence exists to support the trial court's order. *South Carolina Department of Highways & Public Transportation v. Mooneyham*, 275 S.C. 205, 269 S.E. (2d) 329 (1980).

*Folkens*, 300 S.C. at 254-55, 387 S.E. (2d) at 267.

As outlined herein, there was conflicting evidence on the liability issue. Therefore, we conclude the trial judge did not abuse his discretion in denying the motion for a new trial under the "thirteenth juror" doctrine.

### VERDICT OF JURY

Additionally, the Board asserts the court erred in ▮▮▮ denying its motion for a new trial because the verdict was grossly excessive and based on matters outside the evidence. If the amount of a verdict is grossly excessive so as to be the result of passion, caprice, prejudice, or some other influence outside the evidence, the trial judge must grant a new trial absolute. *Cock-n-Bull Steak House, Inc. v. Generali Ins. Co.*, — S.C. —, 466 S.E. (2d) 727 (1996); *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 431 S.E. (2d) 557 (1993); *O'Neal v. Bowles*, 310 S.C. 483, 427 S.E. (2d) 652 (1993); *Rush v. Blanchard*, 310 S.C. 375, 426 S.E. (2d) 802 (1993). "The jury's determination of damages, however, is entitled to substantial deference." *Rush*, 310 S.C. at 379, 426 S.E. (2d) at 805. "The denial of this motion is within the trial court's discretion, and absent an abuse of discretion, it will not be reversed on appeal." *Cock-n-Bull Steak House*, — S.C. at —, 466 S.E. (2d) at 731

(citing *Rush v. Blanchard*, 310 S.C. 375, 426 S.E. (2d) 802 (1993)).

Gastineau presented the testimony of Dr. Oliver Wood, a professional economist, as an expert on the issue of his economic loss. Based upon Gastineau's salary and benefits, Dr. Wood testified Gastineau's total loss if he did not find future employment was $772,566, and the loss was $572,668 if he did find future employment at $6.00 per hour.

"[W]here the amount of the verdict falls within the range of damages testified to, the verdict cannot be disturbed on ground of excessiveness." *Buzhardt v. Cromer*, 272 S.C. 159, 163, 249 S.E. (2d) 898, 900 (1978). The jury verdict of $375,000 is well within the range of the evidence.

During their deliberations, the jurors sent a note to the court with the following questions:

1. Who is the insurance company for the rehab center?
2. May we see depositions?
3. Mental Retardation expert to ellaborate [sic] on Mr. Gastineau's chances to obtain new employment?
4. Is Mrs. Gastineau's employed? Does she have insurance? Is the Board insured?
5. Is the Attorney's fee priviledged [sic]? What's the fee? Court costs?

After reviewing the note with counsel, the trial judge advised the jurors they were asking questions upon which no evidence had been presented. He instructed them to base their decision only upon the evidence presented at trial and there was no procedure to allow new evidence to be received. As far as we can tell from the record, there was no mention of liability insurance during the trial and the jurors inquired about it on their own. We conclude the court properly instructed the jury to consider only the evidence presented and handled the questions in an appropriate manner. Therefore, we find no error in the court's denial of the new trial absolute motion.

Affirmed.

CURETON, J., concurs.

GOOLSBY, J., dissents in separate opinion.

GOOLSBY, Judge (dissenting):

I respectfully dissent and would reverse the judgment below on the ground that there is no evidence, circumstantial or otherwise, that would support a verdict in favor of the respondent James E. Gastineau even when the evidence and all its reasonable inferences are viewed in the light most favorable to Gastineau.

Gastineau's claim either stands or falls on the question of knowledge by either Leigh Murphy or the Beaufort County Mental Retardation Board of Gastineau's or his wife's reporting of alleged wage and safety violations concerning handicapped clients. There is no direct evidence otherwise that either Murphy or the Board knew anything about the Gastineaus' whistleblowing at the time Murphy terminated Gastineau.[1] The majority concedes this but says the conclusion is "inescapable ... that there is sufficient circumstantial evidence in the record to create a factual issue" regarding Murphy's or the Board's knowledge of what the Gastineaus did.

What is the circumstantial evidence from which this "inescapable" conclusion is derived? The majority points to Susan Muckenfuss and a Miss Greenberg, the supervisors of Gastineau's wife at the Beaufort County Rehabilitation Center to whom *she* spoke about the allegations in question, to Alice Shook, an employee of the South Carolina Department of Mental Retardation to whom Gastineau spoke, and to Gary Hudson, an investigator with the Department of Mental Retardation, as Hudson's and the Board's probable informants concerning Gastineau's whistleblowing. Muckenfuss stated neither Gastineau nor his wife made any complaints to her about the alleged violations; Greenberg did not testify; Shook denied ever contacting anyone connected to the Board, including Murphy, about Gastineau's allegations; and there is no evidence that Hudson contacted either Murphy or the Board about Gastineau's complaints. One might well speculate Muckenfuss, Greenberg, Shook, or Hudson told either Murphy or the Board of Gastineau's allegations, but I would hope the time has not yet arrived in South Carolina when cases are de-

---

[1] Indeed, Murphy expressly denied she fired Gastineau because of his whistleblowing activities. She testified she first became aware of his complaints only after Gastineau instituted grievance procedures.

cided on speculation, even that speculation that poses as circumstantial evidence.

I would reverse.